IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,379






BLAINE KEITH MILAM, Appellant



v.



THE STATE OF TEXAS


 



ON DIRECT APPEAL FROM CAUSE NO. CR09-066


IN THE 4TH JUDICIAL DISTRICT COURT


RUSK COUNTY





 Cochran, J., delivered the opinion of the Court in which Keller, P.J., and
Meyers, Price, Womack, Johnson, Keasler, and Alcala, JJ., joined. Hervey,
J., concurred.


O P I N I O N 



 Appellant was indicted in Rusk County for the capital murder of thirteen-month-old
Amora Bain Carson, the daughter of his girlfriend, Jesseca Carson. (1) The case was tried in
Montgomery County after a change of venue. On May 17, 2010, a jury found him guilty, and,
after a separate punishment hearing, the jury answered the future-dangerousness special issue
"yes," the anti-parties special issue "yes," the mental-retardation special issue "no," and the
mitigation special issue "no." (2) The trial judge set appellant's punishment at death. (3) Direct
appeal to this Court is automatic. (4) After reviewing appellant's twenty points of error, we find
them to be without merit and affirm the conviction and death sentence. We note at the outset
that appellant challenges neither the sufficiency of the evidence to support the guilty verdict
nor the determination that appellant is not mentally retarded. Because appellant does
challenge the sufficiency of the evidence to support the future-dangerousness special issue,
we set out, at some length, the facts of the crime and relevant punishment evidence.

I.

A. The State's Guilt-Stage Evidence.

 At 10:37 a.m. on December 2, 2008, appellant called 911, and the first thing he said
was, "My name is Blaine Milam, and my daughter, I just found her dead." Rusk County
Patrol Sergeant Kevin Roy arrived at appellant's trailer home outside Tatum twenty minutes
later. Two ambulances were already there. EMTs were standing in the doorway of the
master bedroom, where appellant and Jesseca Carson were kneeling on the floor. Sgt. Roy
saw "an infant laying on the floor not moving, not breathing, bruised. The baby was laying
on its back, and the face of the baby was just one large bruise." He thought that the circular
bruises he saw on the child's body were caused by a Coke can. He did not recognize them
as human bite marks. 

 After lead investigator Sergeant Amber Rogers arrived, Sgt. Roy took appellant aside
to talk while Sgt. Rogers talked to Jesseca. Appellant told Sgt. Roy that he and Jesseca had
left Amora alone in the trailer and walked up the road to meet a man named Clark who was
going to clear some land for him. They were gone about an hour, and, when they came back,
they found "the baby in that condition." Appellant was calm, collected, and cooperative.
After the interviews, Sgt. Roy read the pair their Miranda rights. He told them that, when
the crime-scene investigation was done, they would be taken to the Sheriff's office for more
questioning and collection of their clothes.

 Shortly thereafter, Kenny Ray, a Texas Ranger, arrived and noticed Jesseca and
appellant embracing. To Ranger Ray, the two looked like "grieving parents," not suspects. 
Ranger Ray conducted an hour-long interview with appellant in the front seat of his patrol
car. Appellant told the ranger that authorities were "more than welcome" to search his car
and home. Appellant denied involvement in Amora's death. He also gave Ranger Ray
names of possible suspects and said that whoever did this should "be hung." In that recorded
interview, appellant explained that Jesseca was his fiancee and that Amora was Jesseca's
child, but that they both lived with him and he was "raising that baby."

 Appellant then told Ranger Ray the same story that he had told Sgt. Roy. He added
that, when he and Jesseca got home, they found Amora, not in her crib, but in a hole in the
floor in the bathroom that he was remodeling. Appellant said Amora had a blood ring around
her mouth, and "it looked like she had been biting the insulation." She was still breathing,
so they called 911. Appellant later told Ranger Ray that Jesseca called 911 before they found
Amora, and that when they found her, she was dead.

 Ranger Ray's tone eventually became accusatory. He told appellant that he knew he
was lying, that no one would believe his story, and that everyone would think he had beat the
baby because he was the only male in the house. Appellant again denied any involvement 
in Amora's death and offered to take a polygraph test. Finally, Ranger Ray told appellant
that he was free to go, meaning that he was free to get out of the patrol car, but not to leave
the scene. By then, Ranger Ray considered appellant a suspect.

 The ranger also interviewed Jesseca. At first she "was crying and acting very
distraught," but then there was a "pretty drastic" change in her demeanor. She referred to
Amora as "that baby" and told Ranger Ray an "extremely bizarre story." (5) 

 The medical examiner gave Amora's cause of death as homicidal violence, due to
multiple blunt-force injuries and possible strangulation. He detailed her injuries: facial
abrasions and bruises; twenty-four human bite marks; bruises, scrapes, and abrasions from
head to toe; bleeding underneath the scalp; extensive fracturing to the back of the skull;
bleeding between the brain and the skull; a laceration to the brain tissue as well as swelling,
bleeding, and bruising; bleeding around the optic nerves; bleeding in the eyes and around the
jugular vein; fractures to the right arm and leg; eighteen rib fractures; a tear to the liver; and
extensive injury to the genitals. There were no old injuries suggesting a pattern of abuse.

 The investigation quickly poked holes in appellant's story. Shane and Dwight Clark,
of Clark Timber, denied any meeting with appellant on December 2nd. Crystal Dopson,
manager of the Insta-Cash Pawn Shop in Henderson, said that, shortly after she opened the
shop on December 2nd, Jesseca and appellant came in and pawned an electric chain saw and
an air impact tool. Surveillance video showed the two in the pawn shop for about fifteen
minutes. Surveillance video from the Exxon in Henderson picked them up shortly thereafter.
Also, appellant had called his sister, Teresa Shea, that morning before 9:30 a.m., crying and
saying that he had "found Amora dead." Teresa told him to call 911, but appellant did not do
so until 10:37 a.m.

 On December 11th, investigators conducted a second search of appellant's trailer and
determined that the south end of the trailer, rather than the master bedroom, was probably the
crime scene. They found blood-spatter stains, consistent with blunt force trauma, near the
south bedroom. Among the items collected from the south bedroom were: blood-stained
bedding and baby clothes; blood-stained baby diapers and wipes; a tube of Astroglide
lubricant; and a pair of jeans with blood stains on the lap. DNA testing later showed that
Amora's blood was on these items.

 On December 13th, appellant's sister, Teresa, went to see appellant in jail. That night,
she told her aunt that she "was needing to find a way to get back out to the trailer in Tatum"
because "Blaine had told her that she needed to go out there to the trailer to get some
evidence out from underneath of it." The aunt called Sgt. Rogers and told her that "she
needed to get out to the trailer immediately, that Teresa was wanting to go out there to get
some evidence out from underneath the trailer." 

 Sgt. Rogers immediately obtained a search warrant, crawled under the trailer, and
discovered a pipe wrench inside a clear plastic bag. The pipe wrench had been shoved down
"a hole in the floor of the master bathroom." Forensic analysis revealed components of
Astroglide on the pipe wrench, the diaper Amora had been wearing, and the diaper and wipes
collected from the south bedroom.

 Dr. Robert Williams, a forensic odontologist, compared the bite marks found on
Amora's body with bite dentition models obtained from appellant, Jesseca, and appellant's
brother Danny Milam. Dr. Williams testified that, to "a reasonable degree of dental
certainty," appellant's dentition matched eight bite marks on Amora. He could exclude
Jesseca from all but one of the bite marks, and he could exclude Danny from all of the bite
marks.

 Shirley Broyles, the nurse at the Rusk County Jail, testified that appellant called for
her one day in January. She found him crying in his cell. He handed her a written request to
talk to Sgt. Rogers, and told Ms. Broyles: "I'm going to confess. I did it. But Ms. Shirley,
the Blaine you know did not do this. My dad told me to be a man, and I've been reading my
Bible. Please tell Jesseca I love her."

B. The Defense Guilt-Stage Evidence.

 Appellant's defense focused on Jesseca as the murderer. The defense called Heather
Carson, Jesseca's mother, who said that Jesseca and appellant starting dating around January
2008 and got engaged a few months later. Jesseca moved in with appellant and his parents
that spring. When Jesseca turned eighteen, she received an insurance settlement from her
father's 2001 death. Heather noticed an immediate change in Jesseca; she became 
withdrawn and stopped caring about her appearance. Jesseca started harassing Heather with
telephone calls. When Heather learned that Jesseca was making serious and unfounded
allegations against her, she stopped talking to her.

 Lisa Taylor testified that Jesseca was her daughter's best friend while growing up in
Alabama. Ms. Taylor knew Jessica as "sweet, outgoing, outspoken, funny." She said that
Jesseca, appellant, and Amora visited them in Alabama twice in the fall of 2008. First, they
came for one night in October. Jesseca was making "bizarre" accusations about her mother. 
In November, the trio returned to Alabama for about four days and said that they were
planning to move there. Ms. Taylor said that there was a "drastic change" in Jesseca's
demeanor. She was "[w]eird, hollow. . . [l]ike empty." Looking into her eyes was "like
looking into a dark space." Jesseca was not taking care of Amora and did not give her a bath
for the whole week. She had appellant change Amora's diaper and feed her. Jesseca
seemed in charge, and when she told appellant to do something, he did it. Ms. Taylor was
concerned that there was something profound going on in Jesseca's life and was worried
about her and her baby.

 A psychiatrist, Dr. Frank Murphy, testified that he was asked to "offer an opinion in
this case of the mental state of Jesseca Carson for the time period beginning sometime around
August of 2008 through December 2nd of 2008." Dr. Murphy read interviews with Jesseca
and other materials but did not talk to Jesseca. Dr. Murphy said Jesseca's symptoms were
consistent with a "psychotic depression . . . . The depression occurs first, and then it gets
severe enough that psychosis or loss of touch with reality then occurs . . . . Psychosis means
someone has lost touch with reality. The vast majority of times, that means either they're
hallucinating or they're delusional."

 The defense odontologist, Dr. Isaac, studied five of the bite marks, and could not
exclude either appellant or Jesseca.

C. The State's Punishment-Stage Evidence.

 The State offered evidence that appellant was-at the time of this crime-on probation
for solicitation of aggravated sexual assault of a child under the age of fourteen. Appellant
had entered the home of an eleven-year-old neighbor, Karah Hodges, and left a stack of
pages torn from pornographic magazines, marked with salacious notes, in Karah's dresser
drawer. Appellant's probation terms prohibited him from going within "200 feet of a
premise where children commonly gather, including school, daycare facility, playground,
public or private youth center, public swimming pool, or video facility." Appellant's "mere
presence" with Amora was, therefore, a continuing probation violation.

 Ranger Ray was recalled to play the entire patrol-car conversation he had recorded
with appellant. Appellant had told Ranger Ray that a third party had forced him to solicit
Karah Hodges. He also discussed several assaults, all of which he described as being of the
"he had it coming" variety.

 Glenda Risinger, who rented an apartment to appellant and Jesseca in the fall of 2008,
testified that when the pair left, the apartment "was trashed. There was stuff left everywhere.
The refrigerator was left open with food still in it. . . . It was pretty much just like they just
went through and trashed it." She also found a lightbulb containing methamphetamine and
a hunting knife in the toilet tank.

 Bryan Perkins, appellant's former boss, testified that appellant had "control issues"
and a "very short" fuse. Appellant would bring Jesseca to work to keep an eye on her. Mr.
Perkins said, "I started talking to him about his controlling problems, you know, that if he
kept on controlling his woman, she was going to leave him. And, you know, he just said it
seemed like, you know, with that baby, him and Jesseca were not really going to have a life." 
Mr. Perkins also described a fight appellant had with a customer.

 Monty Clark, a Rusk County patrol deputy, testified that, in January 2008, he
responded to a fight on the side of the road between appellant and his brother, Danny. He
arrested appellant for assault and family violence.

 Kenneth McDade, a fellow inmate, testified that appellant told him about a plan to
escape from the jail and also threatened to stab him with a pencil.

 Jesseca's friend, Crystal Zapata, described an incident that occurred after appellant's
father died in September but before Amora was killed in December. Ms. Zapata was inside
the trailer with Amora, while appellant and Jesseca were arguing outside. Appellant had a
gun and threatened suicide; Jesseca was trying to calm him down. Ms. Zapata heard a
gunshot. After a few minutes Jesseca came in the door crying and told Ms. Zapata that he
had shot into the floorboard of her car when she tried to keep him from leaving. Ms. Zapata
characterized appellant as dominant in the relationship.

D. The Defense Punishment-Stage Evidence.

 The defense sought to rebut the State's future-dangerousness evidence with both lay
and expert witnesses. 

 Appellant's mother, Shirley Milam, attributed appellant's solicitation of aggravated
sexual assault to his mental immaturity. She said he stopped maturing emotionally at age
twelve. She testified that appellant had an on-and-off methamphetamine problem and that
he had started using drugs again shortly after his father's death. Shirley testified that, after
the second time appellant tried to commit suicide to "go be with [his] daddy," she
unsuccessfully tried to have him civilly committed. In early November, Jesseca and
appellant brought a Ouija board to Shirley's work and told her that they could communicate
with their dead fathers.

 Appellant's older sister testified that appellant was a polite, passive child and a polite,
passive adult. This crime was completely out of character for him. Appellant's childhood
friend said that he did not think appellant was capable of Amora's murder or aggravated
sexual assault. He echoed what appellant's family members said about the effect of his
father's death: "It affected him really bad, because like him and his dad was real close."

 Dr. Patricia Rosen, a medical toxicologist, testified that toxicology reports indicated
that appellant had 0.17 milligrams of methamphetamine per liter of blood in his system on
December 2nd. Dr. Rosen said this was a "high" dose-ten times the therapeutic dose. 
Another expert testified about the effects of methamphetamine on the brain and gave her
opinion that appellant was a chronic methamphetamine user, whose heavy use could have
caused severe psychosis.

 Dr. Mark Cunningham, a clinical and forensic psychologist, testified that he was asked
to evaluate two issues concerning appellant: 1) "how did we get here?" and 2) "where do we
go from here?" Dr. Cunningham interviewed appellant three times, for a total of nearly ten
hours. He also interviewed appellant's mother and sisters, and reviewed "a huge volume of
records." Dr. Cunningham summarized the answer to the "how did we get here" question: 

 There's mental deficiency, youthfulness, meth dependence, meth psychosis,
Jesseca's psychosis. Those are all interacting with each other. That's all part
of the matrix of his psyche. Now, it's not just those things, of course. There's
also the trauma and deprivation, the social deprivation I'm describing, as well
as the trauma of his dad's illness, and those experiences. There is the social
isolation that came about that robs him of social resources that he might have
called upon for some reality testing. There's premature responsibility. There's
the death of his father. All of these things are being loaded on and are
interacting with each other, as we're coming up to this offense, and the effect
of that is this tragedy.

 Dr. Cunningham answered the "where do we go from here?" question by outlining the
reasons why appellant was "likely to have a nonviolent adjustment, in terms of no serious
violence, to a life without parole sentence in TDCJ." 


 Appellant's "nonviolent adjustment to 17 months jail pretrial"; (6)

 "Appraisal of the correctional staff was not that [appellant] was going to be a
predatory inmate that they needed to lock down";

 Appellant's history of employment: starting work at 16, and gaining "a pretty
significant employment history for a kid that's arrested when he's 18";

 Appellant's continuing contact and relationship with family;

 The relatively low rate of major assaults committed by capital inmates serving
a life term;

 The fact of serving a sentence of life without parole ("inmates facing
life-without-parole sentences and long sentences have more to lose. This is
where they're going to be for a very long time and potentially the rest of their
lives, and because of that, they are particularly motivated not to make this
experience any more horrible on themselves than it has to be.");

 The fact that he would be an inmate in the Texas prison system ("99.9 percent
of inmates in Texas prisons in 2009 did not commit an assault resulting in
injuries with more than first aid treatment");

 The option of appellant going to the Hodge Unit ("a unit for intellectually
limited individuals" with a program designed to meet their needs "and help
prevent them from being victimized by other inmates"); 



 

 The option of protective custody ("because of the nature of his offense . . . for
his safety so that other inmates didn't act out on him. Those conditions of
confinement would look in many ways like administrative segregation.")


On cross-examination, Dr. Cunningham testified that he is always a defense expert because
"the research is very clear that the overwhelming majority of capital offenders will never be
violent in prison, that the rates of serious violence in prison are very low, that prisons are
extraordinarily effective in minimizing the occurrence of serious violence."II.

A. Appellant's Oral Statement to Ranger Ray.

 In his first two points of error, appellant argues that the admission of his oral
statement to Ranger Ray violated both Article 38.22 and his Fifth Amendment rights. 

 Ranger Ray did not read appellant his statutory or Miranda rights, so the admissibility
of his oral statement depends upon whether appellant was in custody-"a term of art that
specifies circumstances that are thought generally to present a serious danger of
coercion" (7)-when he gave it. We address these points together because "[o]ur construction
of 'custody' for purposes of Article 38.22 is consistent with the meaning of 'custody' for
purposes of Miranda." (8)

 The Supreme Court recently reiterated the test for determining whether a person is in
custody for purposes of Miranda: The first step "is to ascertain whether, in light of the
objective circumstances of the interrogation, a reasonable person would have felt he or she

was not at liberty to terminate the interrogation and leave." (9) If the answer is "yes," then we
ask the "additional question whether the relevant environment presents the same inherently
coercive pressures as the type of station house questioning at issue in Miranda." (10)

 In Dowthitt, we outlined four general situations which may constitute custody: 

 (1) when the suspect is physically deprived of his freedom of action in any
significant way; (2) when a law enforcement officer tells the suspect that he
cannot leave; (3) when law enforcement officers create a situation that would
lead a reasonable person to believe that his freedom of movement has been
significantly restricted; and (4) when there is probable cause to arrest [and the
officers' knowledge of probable cause is communicated to the suspect] and
law enforcement officers do not tell the suspect that he is free to leave. (11) 


These situations will indicate custody if the circumstances would lead a reasonable person
to believe that he is under restraint to the degree associated with an arrest. (12)

 We afford almost total deference to a trial judge's "custody" ruling when the questions
of historical fact turn on credibility or demeanor, and otherwise review the ruling de novo. (13)

 We first examine all of the circumstances surrounding the interrogation-"the location
of the questioning, its duration, statements made during the interview, the presence or
absence of physical restraints during the questioning, and the release of the interviewee at
the end of the questioning" (14)-to determine whether a reasonable person in appellant's shoes
would have felt he was not at liberty to end the interrogation and leave. (15) 

 Appellant agreed to talk to Ranger Ray, and the questioning took place in the ranger's
patrol car parked in appellant's driveway. The interview was relatively short, just under one
hour. Statements made to and questions asked of appellant ranged from friendly to
accusatory. Appellant was not handcuffed or physically restrained, and he was released from
the patrol car at the end of the interview. But, as appellant points out, before talking to
Ranger Ray, he had been told that he would be taken to the county jail for further questions
and the collection of his clothes. He told Ranger Ray, as the interview was ending,

Appellant: Yeah, and they're taking me and Jess up to the police station.


Ray: I don't know anything about that. Okay. Well, I tell you what, let's-let me-let
me put just a little old ending on this tape. It's approximately 12:36 p.m., and,
again, I'm-this is Sergeant Kenny Ray with the Texas Rangers out of Tyler,
and I've been conducting a noncustodial interview with Blain Keith Milam at
his residence in the northern part of Rusk County on County Road 2125. And
you are free to go, my friend. Thank you for talking to me.


Appellant: All right.


 Under these circumstances, the various law-enforcement officers created a situation
that could possibly lead a reasonable person to believe that his freedom of movement had
been significantly, if temporarily, restricted. We therefore look to the additional question of
"whether the relevant environment presents the same inherently coercive pressures as the
type of station house questioning at issue in Miranda." (16) Or as stated in Dowthitt, we look
to see if the circumstances would lead a reasonable person to believe that he is under restraint
to the degree associated with an arrest. (17)

 The Supreme Court, in Howes v. Fields, singled out communicated non-custodial
status as the most important factor in determining that an inmate taken from his cell to a
prison conference room for questioning about events that occurred outside the prison was not
"in custody" for Miranda. (18)

 That critical factor was present here. Ranger Ray consistently told appellant he was
not in custody: "you're not under arrest"; "you don't have handcuffs on"; "we're just sitting
and visiting"; "you know you're not under arrest. You're not in custody, okay"; "You can
do whatever you want. You're not under arrest"; "We're through talking. Like I told you,
you're sitting in my car. You don't have handcuffs on. You came over here voluntarily. 
We've just-we've just been sitting here talking. You're not-You're fixing to just get out and
walk out. I mean, you're not under arrest. I'm telling you that right now."

 Appellant knew that he was not free to leave the crime scene, but that fact would not
strike any reasonable person, standing in appellant's shoes, as unusual or indicative of his
"arrest" or that of anyone else. This was a major violent crime. Reasonable people are well
aware that, as a matter of course, evidence is collected from crime scenes and from the
people present at crime scenes. (19) Further, appellant was told that his mother and brother
would also be taken to the police station and then brought back.

Appellant: Where's my mama?


Roy: Her and Danny went up to the office. . . Same thing they're going to do with
you and Jesseca. We're going to carry you up there.


Appellant: And bring us back?


Roy: Yeah, we'll bring you right back. We're not going to leave you stranded.

 The State notes that the various officers can be heard on the dash-cam audio talking
to each other and to appellant's brother, stating that no one was in custody.

 Given all of the circumstances, we cannot say that the trial judge abused his discretion
in finding that appellant was not in custody when he was interviewed by Ranger Ray. (20) 
Admission of the resulting oral statement-which contained no confession--did not violate
Article 38.22 or the Fifth Amendment. Points of error 1 and 2 are overruled.

B. Voir Dire Issues. 

1. Veniremember Trzeciak 

 In his third point of error, appellant claims that the trial judge erred by granting the

State's challenge for cause against veniremember Trzeciak in violation of Witherspoon v.
Illinois (21) and Wainwright v. Witt. (22) In a capital prosecution, a prospective juror is not subject
to a challenge for cause merely because he is opposed to or has "conscientious scruples"
about the death penalty. (23) Under Witherspoon and Witt, however, the trial judge may excuse
prospective jurors based upon their views of the death penalty if these views would "prevent
or substantially impair the performance of his duties as a juror in accordance with his
instructions and his oath." (24)

 In determining whether the trial judge abused his discretion in ruling on a challenge
for cause, we review the voir dire record in its entirety and ask whether the judge had a
rational basis for his ruling. (25) We grant the trial judge considerable deference, because he
is in the best position to evaluate the prospective juror's demeanor and responses. (26) 

 In this case, the trial judge instructed the prospective jurors that they should not come
forward at the end of the judge's voir dire to discuss their feelings about the death penalty,
but instead should wait until they were called individually. Despite that request, venireman
Trzeciak came forward and indicated that he did not think that there were any circumstances
in which he could vote for the death penalty. 

Trzeciak: My thought on that is-I wanted to share with the Court that I don't believe
there's a circumstance where I could condone or vote for the death penalty,
based on my personal religious beliefs.


Judge: All right.


Prosecutor: Mr. Trzeciak, basically, you just wanted to come tell the Court that no matter
what circumstances may be out there, you've already decided you could not
consider the death penalty?


Trzeciak: I cannot do that, yes.



Prosecutor: Irrelevant of whatever that may be?


Trzeciak: Irrelevant of whatever that may be.


Prosecutor: You felt compelled to come tell us that now, rather than waiting to
questioning, because you feel that strongly about it?


Trzeciak: Well, I feel that strongly about it, and I didn't want to waste the Court's time
in the future. I didn't know if that was going to be captured later on based
upon the questionnaire that you put out, so I just wanted to let that be known
now.


Defense: . . . If the Court asks you or instructs you to render a true verdict, meaning will
you answer those questions truthfully, the first one being in essence from
listening to all the testimony, can you make a decision as to whether or not the
defendant will be a danger to commit future acts of criminal violence, to be
violent in the future? Could you answer that question truthfully, if so
instructed?

 

Trzeciak: Well, I'm going to try. I understand the question you're asking. If you're
asking. I would then go back to-in today's society, in my opinion and the
opinion of my church, there's no justification for the death penalty. If
I-rendering some sort of verdict in phase two, the potential exists for the death
penalty; I could not vote that way.


***

Prosecutor: Okay. But that based upon your religious feelings, that you would be very,
very compromised to be in this sort of a situation?


Trzeciak: That's correct.

***

Judge: Sir, let me ask you this question. Can you return a verdict which assesses the
death penalty in a case? You understand you're never going to write "death
penalty."


Trzeciak: Right.


Judge: But can you, in good conscience-and I don't care what your answer is. I just
need to know. Can you return a verdict which assesses a death penalty?


Trzeciak: I could not. 


 The State challenged Mr. Trzeciak for cause. Appellant objected, arguing that Mr.
Trzeciak said that he would answer the questions truthfully, despite his views on the death
penalty. The judge overruled the objection.

 Appellant now argues that the State did not go far enough to disqualify Mr. Trzeciak
because he never explicitly said that he would consciously distort answers to the special
issues to prevent imposition of the death penalty. But Mr. Trzeciak was clear that he could
not follow the law in answering the special issues and would be unable to return a verdict
leading to the death penalty. Although he stated that he would "answer questions truthfully,"
he also said that there was no set of circumstances under which the death penalty would be
justified, based on his religious beliefs. Furthermore, Mr. Trzeciak explicitly stated that he
could not return a death-penalty verdict. 

 On this record we cannot find that trial judge abused his discretion in granting the
State's challenge for cause. Mr. Trzeciak's answers concerning his inability to assess the
death penalty under any circumstances were sufficient to support the trial judge's conclusion
that he would be substantially impaired in his abilities as a juror. (27) Accordingly, we overrule
appellant's third point of error.

2. Veniremember Shaw

 In his fourth point of error, appellant contends that the trial judge erred in overruling
his Batson (28) challenge to the State's peremptory strike of black veniremember Shaw. A
defendant objecting under Batson must make a prima facie showing of racial discrimination
in the State's exercise of its peremptory challenges. (29) If the defendant makes a prima facie
showing of discriminatory motives, the State then has the burden to produce a race-neutral
explanation. (30) If the State articulates a race-neutral explanation, the burden remains with the
defendant to show that the State's proffered reasons are mere pretexts for discrimination. (31) 
The trial judge must then decide whether the defendant has proven purposeful
discrimination. (32) Because the trial judge's decision often turns largely on an evaluation of
credibility, we give the judge's ruling great deference and will not disturb it unless it is
clearly erroneous. (33)

 After the defense objected under Batson to the State's use of a peremptory challenge
against veniremember Shaw, the prosecutor offered a race-neutral explanation for her strike. 
The prosecutor explained that she struck Ms. Shaw because she indicated, at least eight times
on her questionnaire, that she was personally against the death penalty. (34) 

 Appellant argued in response that the State spent nearly two hours questioning Shaw
during voir dire, which was the longest amount of time spent with any prospective juror
besides veniremember Lucas, also a black juror. Appellant added that the prosecutor twice
referred to Ms. Shaw outside of the courtroom as an "angry black female." The prosecutor
admitted to using the term after questioning Ms. Shaw, but stated that neither that remark nor
Shaw's race had anything to do with the strike. Regarding the two hours of questioning, the
prosecutor explained that she had hoped to be able to challenge Ms. Shaw for cause because
of her views about the death penalty in her questionnaire answers.

 Because the State offered race-neutral reasons for its strike and appellant failed to
rebut those reasons, we hold that the trial judge did not clearly err in denying appellant's
Batson challenge. (35) Appellant's fourth point of error is overruled. 

C. The Admission of Autopsy Photographs.

 In his fifth point of error, appellant argues that the trial judge erred by admitting
highly prejudicial and irrelevant autopsy photographs. He specifically complains that the
admission of State's Exhibits 92-112 violated Texas Rule of Evidence 403, as well as the
due-course-of-law and due-process clauses of the Texas and U.S. Constitutions. Because his
only argument deals with Rule 403, that is the only basis for exclusion that we will address.

 Under Rule 403, if the use of a photograph is helpful and "relevant, legitimate, and
logical to the testimony that accompanies it," the trial judge may exclude it only if its
emotional and prejudicial aspects substantially outweigh the helpful aspects. (36) In a Rule 403
analysis of autopsy photos, factors such as the "number of exhibits offered, their
gruesomeness, their detail, their size, whether they are black and white or color, whether they
are close-up, whether the body is naked or clothed" are appropriate for consideration. (37) We
review the trial judge's Rule 403 ruling for an abuse of discretion. (38)

 Appellant argues that these autopsy photographs had no probative value concerning
any disputed fact because he did not contest the manner and cause of Amora's injuries or
death. Although he did not expressly contest the manner and cause of Amora's death,
appellant did hold the State to its burden of proving its case beyond a reasonable doubt by
consistently challenging the rough-shod manner of the investigation and handling of physical
evidence. He also challenged the assertion that most of the injuries were inflicted before
Amora's death. Moreover, the State had the burden of proving that appellant intentionally
or knowingly murdered the infant, "and the photographic representation of the injuries tends
to establish this element in a way which testimony by witnesses could not as accurately
portray." (39)

 The autopsy photographs admitted-only twenty of the some 300 autopsy photos-were
personally selected by the medical examiner, Dr. Keith Pinckard, to best illustrate his
testimony. (40) The color photographs were displayed on a projector. Multiple photographs
were necessary because multiple injuries were inflicted. Dr. Pinckard testified that, even
after the autopsy, he could not tell exactly which injury caused death. Rather

 there were many injuries present, and there was also, as I indicated, the pretty
good possibility that strangulation was also involved. So we have the
possibility for strangulation. We have a head injury that could easily cause
death. We have a liver injury that might cause death, although there wasn't a
whole lot of bleeding, so maybe not here. And then, of course, we have a
number of injuries to-just the bruising itself was so extensive on the body, you
can actually experience effects just from the amount of bleeding that occurs
into the tissue. So rather than anything specific, we certified the cause of death
as homicidal violence, because it was obviously inflicted, including multiple
blunt force injuries and possible strangulations.

The autopsy photographs were probative of the fact that this was a cruel and deliberate
killing-with multiple injuries inflicted ante-mortem, rather than post-mortem. These 
photographs, which simply showed the number and type of injuries Amora suffered, could
add little to improperly inflame or prejudice the jury. The trial judge did not abuse his
discretion in admitting the autopsy photographs. (41) We overrule appellant's fifth point of
error. 

D. Crime Lab Accreditation-Tex. Code Crim. Proc. art. 38.35.

 In his sixth point of error, appellant argues that the trial judge abused his discretion
in admitting the testimony of Dr. Robert Williams, a forensic odontologist, in violation of
Article 38.35-which makes the admissibility of some forensic evidence contingent on
whether the analysis of the evidence was conducted at an accredited laboratory.

 Article 38.35(d) provides, in relevant part, that 

 a forensic analysis of physical evidence under this article and expert testimony
relating to the evidence are not admissible in a criminal action if, at the time
of the analysis, the crime laboratory conducting the analysis was not accredited
by the director under Section 411.0205, Government Code. (42) 

Subsection (d) was added to Article 38.35 in 2003, in response to problems with the DNA
evidence testing and examination operations in the Houston Police Department Crime Lab. (43)

 Before Dr. Williams testified, a hearing was held, outside the jury's presence, on
appellant's Article 38.35 challenge. Appellant did not dispute that Dr. Williams is the chief
forensic odontologist for SWIFS (44) or that SWIFS is an accredited crime lab. His objection
was two-fold. First, appellant alleged that Dr. Williams's work in this case was done as part
of his private dental practice, rather than for SWIFS. Second, SWIFS, although accredited
through ASCLD/LAB-L (45) for various scientific disciplines, was not certified for odontology. 
The trial judge overruled appellant's objections, but gave him a running objection to all of
Dr. Williams's testimony. We review that ruling for an abuse of discretion. (46) 

 First, the record supports the trial judge's implicit finding that Dr. Williams conducted
this analysis for SWIFS. The medical examiner testified that, because it was "incredibly
obvious" that the baby was covered in human bite marks, he called in Dr. Williams "so that
he would he able to take his own photographs." Dr. Williams testified that he is an
independent contractor for SWIFS. He said that he was called to the autopsy suite at SWIFS
by Dr. Pinckard, the medical examiner. When he gets such a call, he winds up the work in
his own practice "immediately" and then heads for the Medical Examiner's Office. Dr.
Williams explained that he works as an independent contractor for a number of labs because
most medical examiner offices "do not have the budget to be able to pay someone a full-time
salary[.]"

 Second, SWIFS, according to Defense Exhibit 9 ("Current List of DPS Accredited
Labs from Texas, 8/6/2009"), was one of eight accredited labs, and in fact the most
extensively "accredited" of the eight. (47) Article 38.35 does not specify that the crime
laboratory must be certified in the exact discipline that is the subject of the testimony. (48) And
odontology is not one of the disciplines for which accreditation is available. (49) Nevertheless,
odontology is a species of impression evidence, and Chapter 37, Section 28.145(d) of the
Texas Administrative Code provides that

 the subdiscipline of impression evidence, including footwear, tiretrack, and
similar impression evidence, may be administratively assigned by the
laboratory to its trace evidence section, firearms section, or questioned
document section. The director deems impression evidence to be a
subdiscipline of several disciplines under this subchapter, including trace
evidence, firearms/toolmark, or questioned documents.

SWIFS was, as the prosecutor pointed out to the trial judge, accredited in the trace-evidence
and firearms/toolmark disciplines. Given this record, we conclude that the trial judge did not
abuse his discretion in overruling appellant's objection to Dr. Williams's testimony. (50) We
overrule point of error six.

E. Future Dangerousness.

 In his seventh point of error, appellant argues that the evidence is legally insufficient
to support the jury's affirmative answer to the "future-dangerousness" special issue. 

 A jury may consider a variety of factors when determining whether a defendant will

pose a continuing threat to society. (51) The facts of the offense alone may suffice to support
the jury's finding of future dangerousness. (52) We view the evidence in the light most
favorable to the jury's finding and determine whether any rational trier of fact could have
found, beyond a reasonable doubt, that there is a probability that appellant would commit
criminal acts of violence that would constitute a continuing threat to society. (53)

 The circumstances of Amora's murder are, by themselves, sufficient to sustain the
jury's finding of future dangerousness. Appellant savagely beat, bit, strangled, and sexually
mutilated the thirteen-month old daughter of his girlfriend-either alone or with her. Dr.
Pinckard testified that this was "not a quick event" because of the number of injuries that are
"clearly antemortem." He agreed that "anyone who would inflict these injuries on Amora
would have had to have known that death was reasonably certain to be the result." Dr.
Pinckard testified that he had never-in his decades of experience-seen a more severe case
of child abuse. Evidence that a murder was committed with deliberation and forethought
may be sufficient for a finding of future dangerousness. (54)

 Evidence of a defendant's prior criminal record may also serve as the basis for a
finding of future dangerousness, and this jury was presented with evidence of appellant's
prior solicitation of aggravated sexual assault of his eleven-year-old neighbor. (55)

 Appellant asserts that the future-dangerousness special issue requires the jury to
determine whether a capital defendant would be a continuing threat to prison society. And
under this "future danger test of Berry [v. State, 233 S.W.3d 847 (Tex. Crim. App. 2007],"
the "State has failed to prove that [appellant], unless executed, would ever pose the threat of
criminal violence he posed in this case-danger to a child." That is, if appellant were allowed
to live, he would spend the rest of his life in prison and therefore never have the opportunity
to hurt a child again. Appellant acknowledges that in Estrada v. State and Coble v. State, we
interpreted the future-dangerousness special issue to ask whether a defendant would be a
continuing threat "whether in or out of prison." (56) Appellant asserts that the Coble-Estrada
construction of the future-danger test permits consideration of hypothetical predictions and
is inconsistent with the Supreme Court's holding in Jurek v. Texas, (57) which interpreted the
Texas statute as "requiring a literal prediction of future criminal conduct made to further the
goal of incapacitation." (58) He argues, "Keeping faith with Jurek, this Court should here apply
the future danger test of Berry which considers the restraints inherent in the alternative
sentence to death." (59) We have rejected this argument. (60)

 Further, the State's case for future dangerousness was not "child-specific." The jury
heard about appellant's escalating pattern of violence. He settled his scores with adults with
violence-he "caught a guy in his apartment, and he commenced to whupping his ass." He
"took care of" a guy he found with his niece. He fought with his brother because he was
tired of arguing about cigarette smoke: "I was tired of arguing with him, and I wasn't going
to argue with him, so I hit him in the mouth." Deputy Clark-who investigated the
fight-testified that appellant's mother asked him, "What can be done about Blaine?"

 She said that his temper had progressed from the years. She said that he had
began with becoming upset and showing anger through his emotions, and she
said he went from that to verbal abuse. She said over the years he went to
physical abuse, and she said that it's been ongoing and uncontrollable. She
said this is just getting to the point where she couldn't control it, and now [his]
brother is getting to where he can't control it. And she asked me what can be
done about his--about his actions . . . .

 And this case is distinguishable from Berry for yet another reason: The jury heard that
appellant, while he was in Rusk County jail, told another inmate of his plan to escape. "He
said his brother was going to have a bomb threat put on the jail, so that everybody in K Tank
would get let out." He was then going to escape to Mexico. Appellant ended up threatening
this inmate after they got in to an argument, saying "if I kept messing with him, I would wake
up with a pencil in my side." Because he feared retaliation, the inmate never reported the
threat until appellant was moved from K Tank. Appellant's pattern of violence did not
diminish, even in jail.

 Having viewed all of the evidence in the light most favorable to the jury's finding, we
conclude that a rational jury could have found, beyond a reasonable doubt, a probability that
appellant would pose a continuing threat to society. (61) Point of error seven is overruled.

F. Racial Prejudice.

 In his eighth point of error, appellant argues that the trial judge erred, in the
punishment phase, in admitting evidence of appellant's father's racial prejudice. Appellant's
friend, Chris Lay, testified about the end of appellant's schooling in the fourth grade.

A. Educationally [he was slow], because, I mean, he got pulled out of school in the
fourth grade because people picking on him, you know. His dad got tired of it and
said he didn't want him in school no more, if everybody was going to mess with him
like that.


On cross-examination, the prosecutor revisited appellant's exit from school:

Q. And you've-you visited with Missy, our investigator, over the weekend, right? . . .
And you told her that part of the reason why he got pulled out of school was because
his dad was upset because his principal was black.


A. Well, he was upset because-yeah, that, too.


The trial judge overruled appellant's Rule 403 objection. Outside the presence of the jury,
the prosecutor explained that she presented the evidence to refute the false impression that
Mr. Lay had given to the jury. (62) Defense counsel pointed out that the jury already knew,
from previous testimony, that appellant was pulled from school after the paddling and that
this was

 nothing more than a direct appeal to that jury for unfair prejudice against him
through his father. It's not like this man had any belief like this. We're talking
about a child who was in the fourth grade. And they want to bring in the fact
the father pulled him out because the principal was black? And I believe what
the witness testified to is he was pulled out because he was paddled, which
was not a false impression, because that's exactly what the jury was told. It
just-you noted it for the record. You've done-you've made your ruling, and
I've had my say. Fine. Move again for a mistrial.

 The trial judge overruled the motion for mistrial, but gave the jury the following
limiting instruction.

 Ladies and gentlemen, the Court overlooked this prior to beginning the
testimony of this witness. I want to instruct you concerning some prior
testimony this morning. You're not to hold any alleged racial statements
allegedly made by this defendant's father against this defendant, or infer that
this statement or these statements are or is the belief or view of this defendant,
and any racial content of any alleged statement is not to be inferred upon this
defendant. 


 Appellant now argues that "it was irrelevant that the principal who paddled Milam,
causing his father to take him out of school, was African-American." (63) The State counters
that the evidence was relevant to impeach Mr. Lay and "to counter the assertion that the sole
reason Appellant was removed from school was because he was unfairly picked on." (64)

 A trial judge's relevancy rulings will not be disturbed absent an abuse of discretion. (65)
Appellant relies on Bell v. State, in which the Beaumont Court of Appeals held that it was
reversible error for the State to elicit testimony, at the punishment stage, from the defendant's
mother about racially charged comments she overheard after her son was found guilty.

 The fact that Ms. Bell may have heard the jury or the prosecutor referred to as
"prejudiced" or "redneck," or that she heard someone comment that the verdict
was unfair because of the fact that the appellant was Black and the jury was
entirely white, without having first connected the source of said comments to
appellant's family or friends, was simply irrelevant as to any issue regarding
appellant. (66) 

 One critical difference between Bell and this case is that in Bell, it was the jury itself
that was accused of being racist. (67) Further, in this case, the trial judge instructed the jury not
to hold appellant's father's possible racism against appellant. There is no indication that the
jury disregarded the trial judge's instruction, and we must presume that it followed those
instructions. (68) Point of error eight is overruled.

G. Examining Experts: Lagrone.

 Appellant's ninth, tenth, and eleventh points of error address the trial judge's ruling,
made at appellant's request, that the experts interviewing appellant be prohibited from asking
him about the facts of Amora's murder. Specifically, appellant argues that the State's
questioning of both the defense and State's experts about that prohibition violated appellant's
right to remain silent (point nine), constituted prosecutorial misconduct (point ten), and
deliberately deceived the jury (point eleven).

1. Soria / Lagrone / Chamberlain

 In Soria v. State, (69) we recognized that a defendant may "waive" his Fifth Amendment
rights to a limited extent by presenting psychiatric testimony. We held that 

 when the defendant initiates a psychiatric examination and based thereon
presents psychiatric testimony on the issue of future dangerousness, the trial
court may compel an examination of appellant by an expert of the State's or
court's choosing and the State may present rebuttal testimony of that expert
based upon his examination of the defendant; provided, however, that the
rebuttal testimony is limited to the issues raised by the defense expert. (70) 


 In Lagrone v. State, we expanded the scope of the rule to allow trial judges to order
criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness
when the defense introduces, or plans to introduce, its own future-dangerousness expert
testimony based upon a psychiatric examination. (71) In Chamberlain v. State, we held the rule
applicable even if the appellant introduces the evidence only in rebuttal. (72) We noted that

 Soria and Lagrone are governed by the principle that if a defendant breaks his
silence to speak to his own psychiatric expert and introduces that testimony
which is based on such interview, he has constructively taken the stand and
waived his fifth amendment right to refuse to submit to the State's psychiatric
experts. The focus is the defendant's choice to break his silence. (73)

 With this background, we turn to the relevant facts. 

2. Relevant Facts

 Before trial, the State filed a motion for a psychological evaluation of appellant to
rebut appellant's psychological testimony. The trial judge conducted a pretrial hearing on
the motion during which the defense asked that the State's expert be prohibited from asking
appellant questions about the facts of the crime. The defense said that it had not let its own
experts talk to appellant about the crime, and that none of them "have used any information
that they gained through him concerning the offense in forming any opinions." The defense
opposed inquiry into the facts on a number of grounds, including the Fifth Amendment right
to remain silent. The State objected, arguing that once a defendant waives his right to remain
silent by talking to experts, he cannot dictate the questions that he is asked.

 Relying on the language contained in Chamberlain, that "the essential principles at
work in Lagrone and Soria are waiver and parity," (74) the trial judge agreed to limit
examination to exclude any discussion of the facts of the crime by both parties.

 All right. The Court has reviewed the cases submitted to it, and the Court-and
primarily based upon language contained in Chamberlain, I am going to limit
the interview to exclude the offense, with the understanding that defendant's
experts will be precluded from offering any . . . findings, conclusions, or
opinions based upon any interview or conversations of the defendant, by the
expert of the defendant, concerning the offense itself. And, of course, this does
not preclude any opinions, findings, or conclusions obtained from sources
other than the defendant. Anything further?


 At trial, Dr. Cunningham, the defense expert, testified that appellant's mental
deficiency is sufficiently severe for him to meet the diagnostic criteria for mental retardation. 
He also testified that appellant had psychotic symptoms related to his methamphetamine
abuse, and that "given the extent of methamphetamine that he was using prior to the crime,
it's very likely that he may have been delusional. It may have induced a psychotic state that
looked similar to schizophrenia. He may have actually had some hallucinations."

 On cross-examination by the prosecutor, the following exchange took place:

Q. . . . When you interviewed the defendant in those 9 hours that you spent with him, you
did not ask him one thing about the capital murder for which this jury has convicted
him, did you?


A. That's correct.


Q. Why?


A. Well, primarily because I was instructed by Counsel not to go into the circumstances,
the events of the offense itself.


Q. Really?


A. Yes, ma'am.

 Defense counsel then renewed the Fifth Amendment objection he had made at the
pretrial hearing. The State responded, "He didn't remain silent. He waived his right to remain
silent, and in talking to the expert, he-there is no such thing as a partial waiver. . . . I have
every right to ask him about that, because it's-once he waives, he waives." The trial judge
overruled the objection, but granted appellant's running objection.

 The prosecutor resumed cross-examination and later asked,

Q. Okay. Well, I'll come back to that. But you do talk to capital murderers about the facts
of the capital murder they've been convicted of.


A. Infrequently. Most of the time I do not. Most of the time defense counsels do not
authorize a discussion about the capital offense. The defendant retains a Fifth
Amendment right to not incriminate himself, even for an evaluation that's being
performed for sentencing purposes . . . .


In rebuttal, the State called Dr. Tim Proctor, and questioned him as follows:

Q. Okay. Now, you've told us that you spent a significant amount of time interviewing
the defendant?


A. Yes.


Q. Were you permitted to talk to this defendant, Blaine Milam, about the facts of the
capital murder case for which he has been convicted?


The trial judge overruled appellant's running objection.

Q. Dr. Proctor, were you able to speak with the defendant about the facts of the capital
murder case for which he was convicted by this jury?


A. No.


Later, the prosecutor asked Dr. Proctor about Dr. Cunningham's opinion that appellant might
have been delusional.

Q. In your field as a psychologist, as a forensic psychologist, is it appropriate to diagnose
someone or to opine that someone is psychotic or delusional without having talked to
them?


A. Well, I think the best way for me to answer that is to tell you what I would do and
what I would teach my students. And I believe that to make an assertion about what
someone's mental state was like at the time of some offense, you have to have talked
to them about that to have a meaningful opinion about that. And without doing that,
I don't know how you can know, especially in the absence of some other piece of
evidence where the person at issue has given a recitation of what happened.

3. Points of Error Nine, Ten, and Eleven

 Appellant argues in his ninth point of error that the trial judge erred in allowing the
above questioning in violation of "the spirit, if not the letter" of the trial judge's previous
order and of appellant's Fifth Amendment right to remain silent. In his tenth point of error,
appellant argues that the State's conduct-in exposing the fact that the experts did not talk to
appellant about the facts of the crime-constituted prosecutorial misconduct. That misconduct
(1) violated his Fifth Amendment right to be free of harm for exercising his right to remain
silent about the facts of his case, (75) and (2) unfairly left "the jury with the impression that
Appellant, on advice of counsel, was attempting to hide important information that bore on
the issue." (76) In his eleventh point of error, appellant asserts that leaving this
impression-when it was actually the trial judge's ruling to prohibit the experts from inquiring
about the facts of the case-amounted to Napue v. Illinois (77) or "false testimony" error because
it discredited appellant and "undermined his case for mental retardation." (78)

 First, the trial judge did not err. This line of questioning did not violate his pretrial
order: That order limited only the questioning of appellant, not the questioning of testifying
experts. And the questioning did not violate appellant's Fifth Amendment right to remain
silent. Appellant broke his silence to speak to his own psychiatric expert and introduced
testimony based on that interview, so he constructively took the stand, and waived the Fifth
Amendment "in the same manner as would his election to testify at trial." (79) The State was
then entitled to offer rebuttal testimony limited to the issues raised by the defense expert. It
was permissible for the State to test Dr. Cunningham's opinions by questioning him (and Dr.
Proctor) about how Dr. Cunningham arrived at those opinions. (80) Appellant may not testify
through a defense expert and then use the Fifth Amendment as a shield against
cross-examination of that expert on disputed issues.

 Second, there was no misconduct. The State did not leave a false impression "that
Milam refused to speak about the facts of the offense, rather than it being the trial court's
decision that the experts not inquire about the facts of the offense." (81) The trial judge limited
inquiry by the experts into the facts of the crime solely at appellant's behest. Appellant chose
not to discuss the crime facts with his expert, and the trial judge entered an order limiting
these expert examinations only because of appellant's request. 

 Third, there was no false testimony. Dr. Cunningham testified he was instructed by
counsel not to inquire into the facts of the case, and Dr. Proctor testified that he was not able
to speak with the defendant about the facts of the case. (82) These were true assertions. They
do not conflict with appellant's request to the trial judge and the trial judge's order based on
that request. (83) Appellant's points of error nine through eleven are overruled.

H. State's Punishment-Stage Closing Argument.

 In his twelfth point of error, appellant argues that two portions of the State's closing
argument violated his Eighth Amendment right to have the jury consider and give effect to
his mitigating evidence, and so denied him his right to a fair trial and reliable sentencing.

 There are four proper areas of jury argument: (1) summation of the evidence presented
at trial; (2) reasonable deduction drawn from that evidence; (3) answer to the opposing
counsel's argument; or (4) a plea for law enforcement. (84) Any appellate claim that a
prosecution argument strayed outside the bounds of these categories is forfeited if there was
no contemporaneous trial objection. (85) If there was a contemporaneous trial objection to
improper jury argument, such argument does not result in reversal "unless, in light of the
record as a whole, the argument is extreme or manifestly improper, violative of a mandatory
statute, or injects new facts harmful to the accused into the trial proceeding." (86)

 Appellant complains about two arguments. First, appellant asserts that the prosecutor
misstated the law on mitigation, misstated the special issue, and prevented the jury from
giving effect to appellant's mitigating evidence, when she argued-over a running
objection-that only evidence of appellant's being abused as a child could justify a life
sentence.

 Mitigating evidence is that which lessens a person's moral blameworthiness
for what he's done. And yes, you have heard evidence from his background
that is unfortunate. You have heard things that I can agree was not the perfect
life growing up; however, the problem is, the fundamental problem is that the
one type of mitigating evidence that could explain this, that I would suggest
to you might be sufficient to explain this act and this conduct and this crime,
is not here. If there was evidence before you that this defendant had been
horribly abused as a child, horribly abused as a child, I could stand before you

***

 [objection overruled]


 Thank you, Your Honor. If he had been somehow horribly abused as a child,
bitten, beaten, violated, perhaps that would be mitigating evidence that would
lessen his moral blameworthiness sufficiently to warrant life. Folks, that's not
here. As much-as much as the Milam family did not do right over the years,
they did not abuse their kids, and nobody else did either. That's not here.
That's the bottom line, and I would suggest to you that really is the only kind
of mitigating evidence that truly can explain why we're here and truly lessen
moral blameworthiness for this. I would ask you, when you're looking at the
mitigating evidence, to go back to that life-altering moment when you first saw
and you first realized what he did to Amora, everything he did to Amora, and
ask yourself what could possibly mitigate that? That is the bottom line where
the fourth question is concerned. The answer to the fourth question is "No."

 

 The prosecutor did not misstate the law on mitigation or the mitigation special issue. 
Article 37.071(f) provides that the jury "shall consider mitigating evidence to be evidence
that a juror might regard as reducing the defendant's moral blameworthiness." (87) Nor did the
prosecutor prevent the jury from giving effect to appellant's mitigating evidence. The
argument was a fair rebuttal to defense counsel's argument that appellant 

 is the reason for this system. He's the reason why we don't say, 'Guilty, death
penalty'. . . . How many mitigating factors are there? In fact, I think I have like
three pages written down here of factors through this kid's life that could be
mitigating and need to be considered . . . . That's why we don't let the mob
mentality decide these cases, because everything that you've heard mitigates
against giving this boy death. 


For these reasons, we find nothing in the prosecutor's remarks to reflect that she was asking
the jury to forgo its duty and automatically answer the special issues in such a way that
appellant would receive the death penalty. (88) The trial judge did not err in overruling
appellant's objection.

 Second, appellant complains that the prosecutor violated his right to a reliable
sentencing determination by falsely arguing that the jury had no choice but to assess death: 
"Sometimes the death penalty is society's last line of self-defense. . . . He has earned it, and
you know it's the only choice." Appellant did not contemporaneously object to this closing
argument, and therefore he has forfeited any complaint on appeal about it. (89) We overrule
appellant's twelfth point of error.

I. Constitutional Challenges to the Texas Death Penalty Statute.

 Appellant's remaining points of error are constitutional challenges to the Texas death-penalty statute. Appellant candidly acknowledges that all of these challenges have previously
been rejected by this Court. Appellant invites us to review our prior positions. We decline
to do so and briefly answer each claim by citing the controlling authority.

 In his thirteenth point, appellant challenges the "10-12" rule, arguing that it violates
his rights under the Eighth and Fourteenth Amendments because it leaves jurors in the dark
about the fact that their failure to unanimously agree on an answer to either special issue
results in a life sentence. This Court has rejected these challenges. (90)

 In his fourteenth point, appellant claims that the trial judge committed reversible error
by charging the jurors that they had discretion to decide whether a particular circumstance
was mitigating. Consistent with Article 37.071, §(2)(f)(4), the trial judge charged the jury
that it "shall consider mitigating evidence to be evidence that a juror might regard as
reducing the

defendant's moral blameworthiness." Appellant argues that the statute violates the Eighth
Amendment, "which permits jurors no such discretion." We have rejected this claim. (91)

 In his fifteenth point, appellant argues that the trial judge's failure to define
"probability," "criminal acts of violence," or "continuing threat to society" violated the
constitutional requirement that each statutory aggravating circumstance genuinely narrows
the class of persons eligible for the death penalty. We have repeatedly held that the trial
judge need not define such terms because we presume that the jury understands them. (92)

 In his sixteenth point, appellant argues that the State's unfettered, standardless, and
unreviewable discretion to seek the death penalty violates his rights under the Equal
Protection and Due Process Clauses and results in cruel and unusual punishment. We have
repeatedly rejected these contentions. (93) 

 In his seventeenth point, appellant argues that the Texas death-penalty scheme violates
due process because the mitigation special issue fails to require the State to prove the absence
of mitigating circumstances beyond a reasonable doubt, contrary to the Apprendi line of
cases. And in his eighteenth point, he argues that the scheme violates due course of law and
results in cruel and unusual punishment in violation of the Texas Constitution because of the
"impossibility of simultaneously restricting the jury's discretion to impose the death penalty
while also allowing the jury unlimited discretion to consider all evidence militating against
imposition of the death penalty." We have rejected these claims. (94)

 In points nineteen and twenty, appellant contends that the cumulative effect of these
constitutional and statutory infringements violates the state and federal constitutions. Having
found no such violations, we hold that these claims are without merit. (95)

 Having overruled appellant's points of error, we affirm his conviction and sentence.

Delivered: May 23, 2012

Do Not Publish
1. Tex. Penal Code § 19.03(a)(8).
2. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) & (b)(2) & (e)(1); see Gallo v. State, 239
S.W.3d 757, 770 (Tex. Crim. App. 2007).
3. Tex.Code Crim. Proc. art. 37.071, § 2(g).
4. Art. 37.071, § 2(h).
5. Because Jesseca did not testify at appellant's trial, none of her statements were admitted
into evidence.
6. Dr. Cunnningham said that he was aware of the Kenneth McDade incident but, "[i]t did
not represent an assault." He said that, in custody, "individuals may puff up. They may say
things to try to build a persona. In other words, they may act bad, puff themselves up, talk trash,
that kind of thing, to try to reduce the likelihood that they would be victimized, so you have to be
careful about how to interpret that when you hear, you know, that there's threat behavior. That's
one part of it. The other part of it is that you want to consider what's the source of this, because
here's what happens. In jail, it's not uncommon for one inmate to try to implicate another inmate
or raise an allegation against them to get some personal advantage for themselves."
7. Howes v. Fields, 132 S.Ct. 1181, 1189, ___ U.S. ___ (2012).
8. Herrera v. State, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).
9. Fields, 132 S.Ct. at 1189 (internal brackets, quotation marks, and citations omitted).
10. Id. at 1190.
11. Dowthitt v. State, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).
12. Id.; see also California v. Beheler, 463 U.S. 1121, 1125 (1983).
13. Herrera, 241 S.W.3d at 526-27.
14. Fields, 132 S.Ct. at 1189.
15. Id.
16. Id.
17. Dowthitt, 931 S.W.2d at 255; see also Beheler, 463 U.S. at 1125.
18. Fields, 132 S.Ct. at 1193.
19. See Fields, 132 S.Ct. at 1190 (the "temporary and relatively nonthreatening detention
involved in a traffic stop or Terry stop does not constitute Miranda custody").
20. See id., 132 S.Ct. at 1193-94; Dowthitt, 931 S.W.2d at 255.
21. 391 U.S. 510 (1968).
22. 469 U.S. 412 (1985).
23. Witherspoon, 391 U.S. at 515.
24. Adams v. Texas, 448 U.S. 38, 45 (1980) (prospective jurors who can set aside their
beliefs against capital punishment and honestly answer the special issues are not properly subject
to challenge for cause); Witt, 469 U.S. at 424 (prospective jurors can be challenged for cause if
their views about the death penalty would prevent or substantially impair the performance of
their duties in accordance with their instructions and oath); see also Segundo v. State, 270
S.W.3d 79, 93 (Tex. Crim. App. 2008) (finding that, although the prospective juror never
explicitly said that his personal views would "substantially impair" his ability to follow the law
in answering special issues, it was nonetheless clear that he could not follow the law if it would
lead to a death sentence). 
25. Granados v. State, 85 S.W.3d 217, 230-31 (Tex. Crim. App. 2002).
26. Davis v. State, 313 S.W.3d 317, 343-44 (Tex. Crim. App. 2010).
27. See Segundo, 270 S.W.3d at 93.
28. Batson v. Kentucky, 476 U.S. 79 (1986).
29. Herron v. State, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); Mathis v. State, 67
S.W.3d 918, 924 (Tex. Crim. App. 2002). 
30. Herron, 86 S.W.3d at 630.
31. Id. 
32. Id. 
33. Id.
34. For example, in one question, which asked her to describe her personal feelings about
the death penalty, Ms. Shaw responded, "Following capital murder I feel that a person should get
life imprisonment without the possibility of parole. There have been too many false convictions
and people put to death that were innocent." When asked to circle which of six statements best
represented her feelings regarding the death penalty, Ms. Shaw circled (E), "I believe we should
abolish the death penalty and I will have a difficult time voting to impose it, regardless of the
facts of the case." On a scale of 0 to 10, 10 being always give the death penalty and 0 being
never, Ms. Shaw circled 0. 
35. See Herron, 86 S.W.3d at 630.
36. Erazo v. State, 144 S.W.3d 487, 491-92 (Tex. Crim. App. 2004).
37. Long v. State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991).
38. State v. Mechler, 153 S.W.3d 435, 438-40 (Tex. Crim. App. 2005).
39. Lanham v. State, 474 S.W.2d 197, 199 (Tex. Crim. App. 1971) (admission of nine
color photographs of battered child, taken shortly after she was placed in police custody was not
an abuse of discretion).
40. Dr. Pinckard actually picked out twenty-one photos, but the trial judge sustained an
objection to State's Exhibit 113 "because of the mutilation shown as a result of the autopsy." 
41. See Sonnier v. State, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) ("[W]hen the
power of the visible evidence emanates from nothing more than what the defendant has himself
done we cannot hold that the trial court has abused its discretion merely because it admitted the
evidence. A trial court does not err merely because it admits into evidence photographs which are
gruesome").
42. Tex. Code Crim. Proc. art. 38.35(d)(1).
43. House Research Organization, Bill Analysis for House Criminal Jurisprudence
Committee, HB 2703, 78th Leg., R.S. (2003).
44. SWIFS is the acronym for "Southwestern Institute of Forensic Sciences."
45. ASCLD/LAB is the acronym for "American Society of Crime Laboratory
Directors-Laboratory Accreditation Board Legacy."
http://www.txdps.state.tx.us/CrimeLaboratory/documents/List_Texas_LabsAccredited.pdf (last
visited May 10, 2012).
46. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).
47. SWIFS, as of that date, was the only one of the eight certified in at least five of the six
disciplines subject to DPS accreditation. No lab was then certified in "Questioned Documents."
48. Article 38.35 does not purport to cover the admission of all forensic evidence-or even
most of it. Many disciplines and procedures are excluded from the definition of forensic analysis
or otherwise exempted from accreditation requirements "based on their nature" or based on the
determination of the Director "that no accreditation is appropriate or available." Tex. Code
Crim. Proc. art. 38.35; Tex. Gov't Code § 411.0205; 37 Tex. Admin. Code § 28.145-147.
Among these are: latent print examination; breath alcohol analysis; digital evidence; forensic
pathology, not including toxicology or other laboratory associated with the office of a medical
examiner; forensic anthropology, entomology, or botany; forensic photography; polygraph
examination; voice analysis; non-criminal testing; viral DNA testing. For the full list see
http://www.txdps.state.tx.us/CrimeLaboratory/LabAccreditation.htm (last visited May 10, 2012).
49. 37 Tex. Admin. Code § 28.145 describes the disciplines and subdisciplines that
involve forensic analysis for use in a criminal proceeding for which accreditation is available
from a recognized accrediting body. Among those disciplines are (1) controlled substances; (2)
toxicology; (3) biology; (4) firearms/toolmark; (5) questioned documents; (6) trace evidence; or
(7) other discipline if approved by a recognized accrediting body and the director.
50. See Ellison v. State, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006).
51. Freeman v. State, 340 S.W.3d 717 (Tex. Crim. App. 2011); Wardrip v. State, 56
S.W.3d 588, 594 & n. 7 (Tex. Crim. App. 2001); Keeton v. State, 724 S.W.2d 58, 61 (Tex. Crim.
App. 1987) The Keeton factors are: (1) the circumstances of the capital offense, including the
defendant's state of mind and whether he or she was working alone or with other parties; (2) the
calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the
crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and
personal circumstances at the time of the offense; (6) whether the defendant was acting under
duress or the domination of another at the time of the commission of the crime; (7) psychiatric
evidence; and (8) character evidence.
52. Fuller v. State, 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008); Sonnier v. State, 913
S.W.2d 511, 517 (Tex. Crim. App. 1995); Kunkle v. State, 771 S.W.2d 435, 449 (Tex. Crim.
App. 1986).
53. Holberg v. State, 38 S.W.3d 137, 139 (Tex. Crim. App. 2000).
54. Id.; see also Sonnier, 913 S.W.2d at 517.
55. Wilson v. State, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999).
56. Estrada v. State, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010); Coble v. State, 330
S.W.3d 253, 268 (Tex. Crim. App. 2010). 
57. 428 U.S. 262 (1976).
58. Appellant's Brief at 52.
59. Id.
60. Freeman, 340 S.W.3d at 726-27 (rejecting a claim that the future-dangerousness special
issue requires the jury to determine whether a capital defendant sentenced to life imprisonment
would be a continuing threat to prison society).
61. See Coble, 330 S.W.3d at 268-69; Estrada, 313 S.W.3d at 281.
62. The prosecutor explained that appellant's father pulled appellant out of school because
"he had been spanked by the principal, and his dad was upset about the principal spanking him;
and he was black."
63. Appellant's Brief at 58.
64. State's Brief at 93.
65. Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).
66. Bell v. State, 948 S.W.2d 535, 540 (Tex.App.-Beaumont 1997, no pet.).
67. Id. at 540-41.
68. Thrift v. State, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (jury presumed to
following limiting instruction).
69. 933 S.W.2d 46 (Tex. Crim. App. 1996).
70. Id. at 58-59 (footnotes omitted).
71. 942 S.W.2d 602, 611 (Tex. Crim. App. 1997).
72. Chamberlain v. State, 998 S.W.2d 230 (Tex. Crim. App. 1999).
73. Id. at 234. Since Chamberlain we have held, in unpublished opinions, that the
Soria/Lagrone line of cases may be extended to psychological examinations of the defendant to
develop mitigating evidence, or determine mental retardation. Ward v. State, No. AP 74695,
2007 WL 1492080 (Tex. Crim. App. May 23, 2007); Lizcano v. State, No. AP-75879, 2010 WL
1817772, *8 (Tex. Crim. App. May 5, 2010) ("The precise nature of the psychological testimony
to be presented is immaterial; that it is being presented by the defendant is enough to trigger the
rule.").
74. 998 S.W.2d at 234.
75. Appellant's Brief at 63.
76. Appellant's Brief at 63-64.
77. 360 U.S. 264 (1959).
78. Appellant's Brief at 67.
79. Chamberlain, 998 S.W.2d at 234; Lagrone, 942 S.W.2d 602; Soria, 933 S.W.2d 46.
80. Lagrone, 942 S.W.2d at 611. See generally, Renteria v. State, No. AP-74829, 2011 WL
1734067, at *42 (Tex. Crim. App. May 4, 2011) (not designated for publication)
(cross-examination of Dr. Cunningham as to why he did not question Renteria about the offense
did not exceed the scope of proper cross-examination; defense counsel called Cunningham to
testify that Renteria would not be a future danger in prison, so it was permissible for the State to
test Cunningham's credibility by questioning him as to how he arrived at that conclusion).
81. Appellant's Brief at 66.
82. State's Brief at 104.
83. See Renteria, 2011 WL 1734067, at *42.
84. Jackson v. State, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000); Brown v. State, 692
S.W.2d 497, 502 (Tex. Crim. App. 1985).
85. Threadgill v. State, 146 S.W.3d 654 (Tex. Crim. App. 2004); Cockrell v. State, 933
S.W.2d 73, 89 (Tex. Crim App. 1996).
86. Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); Todd v. State, 598
S.W.2d 286, 296-97 (Tex. Crim. App. 1980) (panel op.).
87. Tex. Code Crim. Proc. art. 37.071(f).
88. Freeman v. State, 340 S.W.3d 717, 730 (Tex. Crim. App. 2011).
89. Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).
90. Estrada v. State, 313 S.W.3d 274, 306 (Tex. Crim. App. 2010); Williams v. State, 301
S.W.3d 675, 694 (Tex. Crim. App. 2009); Druery v. State, 225 S.W.3d 491 (Tex. Crim. App.
2007); Escamilla v. State, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004).
91. Estrada, 313 S.W.3d at 306; Threadgill v. State, 146 S.W.3d 654, 671 (Tex. Crim.
App. 2004).
92. Russeau v. State, 291 S.W.3d 426, 434-35 (Tex. Crim. App. 2009); Druery v. State,
225 S.W.3d 491 (Tex. Crim. App. 2007); Saldano v. State, 232 S.W.3d 77, 91 (Tex. Crim. App.
2007).
93. Roberts v. State, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); Hankins v. State, 132
S.W.3d 380, 387 (Tex. Crim. App. 2004); Threadgill v. State, 146 S.W.3d 654, 671 (Tex. Crim.
App. 2004); Matamoros v. State, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995).
94. Smith v. State, 297 S.W.3d 260, 278 (Tex. Crim. App. 2009); Fuller v. State, 253
S.W.3d 220, 234 (Tex. Crim. App. 2008); Escamilla v. State, 143 S.W.3d 814, 828 (Tex. Crim.
App. 2004).
95. See Turner v. State, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); Chamberlain, 998
S.W.2d at 238 (non-errors cannot cumulatively cause error).